UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
M. SCOTT BREWER, JAMES E. BROWN,          :   Civil Action No.
SR., MARCUS ESTLACK, KEITH                :
McCLANAHAN, JEREMY JEFFERS,               :   VERIFIED SHAREHOLDER DERIVATIVE
GLENN JEFFRIES, WILLIAM                   :   COMPLAINT FOR BREACH OF
WATERKOTTE, ANDREW WISEMAN,               :   FIDUCIARY DUTY, UNJUST
DENZIL MALONE and GARY R. REED, in        :   ENRICHMENT AND CORPORATE WASTE
Their Capacities as Trustees for the      :
CARPENTERS PENSION FUND OF WEST           :
VIRGINIA, Derivatively on Behalf of       :
EXPRESS SCRIPTS HOLDING COMPANY,          :
                                          :
                      Plaintiffs,         :
                                          :
        vs.                               :
                                          :
MAURA C. BREEN, WILLLIAM J.               :
DeLANEY, ELDER GRANGER, NICHOLAS          :
J. LaHOWCHIC, THOMAS P. MAC               :
MAHON, FRANK MERGENTHALER,                :
WOODROW A. MYERS, JR., RODERICK A.        :
PALMORE, GEORGE PAZ, WILLIAM L.           :
ROPER, SEYMOUR STERNBERG,                 :
CHRISTOPHER A. McGINNIS, DAVID            :
QUELLER, ERIC R. SLUSSER, TIMOTHY         :
WENTWORTH, GARY G. BENANAV,               :
JAMES M. HAVEL and CHRISTOPHER K.         :
KNIBB,                                    :
                                          :
                      Defendants,         :
        – and –                           :
                                          :
EXPRESS SCRIPTS HOLDING COMPANY,          :
a Delaware corporation,                   :
                                          :
                 Nominal Defendant.       :
                                          :
———————————————————— x   DEMAND FOR JURY TRIAL

## OVERVIEW OF THE ACTION

1.      This is a shareholder derivative action on behalf of nominal defendant Express Scripts Holding Company ("Express Scripts" or the "Company") for breach of fiduciary duty, unjust enrichment and corporate waste.  Defendants are Express Scripts' directors – Maura C. Breen, William J. DeLaney, Elder Granger, Nicholas J. LaHowchic, Thomas P. Mac Mahon, Frank Mergenthaler, Woodrow A. Myers, Jr., Roderick A. Palmore, George Paz, William L. Roper and Seymour Sternberg – and its top officers – Christopher A. McGinnis, David Queller, Eric R. Slusser and Timothy Wentworth – and its former director and top officers – Gary G. Benanav, James M. Havel and Christopher K. Knibb (together, "defendants").

2.      Express Scripts is a pharmacy benefits management ("PBM") company that offers a full range of services to its clients, which include managed health care organizations, health insurers, employers and hospitals.  As a PBM, Express Scripts helps health benefit providers improve access and affordability to prescription drugs by, among other things, leveraging substantial purchasing volume to deliver discounts to health benefit providers.

3.      In December 2009, Express Scripts acquired certain subsidiaries of Anthem, Inc. that provided PBM services.  In conjunction with the acquisition, Express Scripts entered into a 10-year contract under which it would provide PBM services to members of the affiliated health plans of Anthem (the "Agreement").  As a result of the Agreement, Anthem, one of the largest health benefits companies in the United States, became Express Scripts' largest and most important client, representing approximately 14% of Express Scripts' annual revenues.

4.      According to the terms of the Agreement, Anthem was entitled to conduct a periodic pricing review to ensure it was receiving "competitive benchmark pricing" from Express Scripts. Express Scripts was in turn obligated to negotiate in good faith over the proposed new pricing terms. In addition, Express Scripts was required to perform services under the Agreement "in a prudent and

expert manner in accordance with this Agreement and all laws," including Centers for Medicare & Medicaid Services ("CMS") regulations. Among its many obligations concerning CMS Medicare Part D prescription drug plans, Express Scripts was responsible for timely submitting Prescription Drug Event ("PDE") files to CMS and for satisfying CMS mandated turnaround times ("TATs") with respect to processing Medicare Part D claims.

5.      On February 16, 2015, Anthem issued a notice of operational breaches concerning the Agreement to Express Scripts. Anthem stated that Express Scripts' performance of the delegated Medicare Part D obligations had not been satisfactory and that Anthem consequently had the right to terminate the Agreement on that basis.

6.      On February 23, 2015, one week after the Company received the notice of breach from its largest customer, defendants misled shareholders by causing Express Scripts to file an Annual Report on Form 10-K with the U.S. Securities and Exchange Commission ("SEC"). The Form 10-K failed to disclose that its largest client, Anthem, had already accused the Company of breaching the Agreement. While hiding this material adverse information from shareholders, defendants also acknowledged in the same 10-K that the Company's financial results would be materially adversely affected if a large client changed the terms of a contract.

7.      Anthem's February 16, 2015 notice of breach was only the first in a series of disastrous events, each leading to a deteriorating relationship between the two companies and creating a significant risk that Express Scripts would lose Anthem's business. Nonetheless, defendants repeatedly caused or allowed the dissemination of materially false and misleading statements claiming a "very, very solid" relationship with Anthem.

8.      On March 18, 2015, Anthem notified Express Scripts that its marketing analysis had determined that the pricing terms contained in the Agreement were not competitive. In response,

Express Scripts failed to meet its obligations to engage in any negotiation for competitive benchmark pricing. In light of Express Scripts' utter refusal to negotiate, on April 1, 2015, Anthem provided the Company with a formal notice of breach of the Agreement. For the next year, Anthem repeatedly notified Express Scripts on dozens of occasions that it was in breach of the Agreement and on several occasions attempted to engage the Company in negotiations. Express Scripts repeatedly ignored Anthem. When Express Scripts finally did engage in dialogue with Anthem on January 7, 2016, it forwarded a proposal that was $12 billion in excess of competitive benchmark pricing. Anthem's repeated attempts at arriving at a mutually agreeable solution were fruitless. All the while, Express Scripts publicly maintained a facade of a positive relationship between the two companies, and failed to acknowledge that it was in danger of losing its biggest client.

9. Despite receiving multiple notifications that Express Scripts was in breach of its Agreement with Anthem, defendants continued to cause Express Scripts to submit various filings to the SEC, participate in multiple investor conference calls, and issue several press releases that failed to mention the Company's ongoing strife with Anthem and the potential impending loss of Express Scripts' biggest client. In fact, when discussing Anthem in these filings and conference calls, Express Scripts officials stated just the opposite – that its relationship with Anthem was solid and that it looked forward to having Anthem as a client through the end of the Agreement term or even longer. Further, when addressing the Company's future, defendant Timothy Wentworth, Express Scripts' Chief Executive Officer ("CEO"), stated that due to the Company's close collaboration with its clients, it remained confident in its client retention rate and expected its momentum to continue.

10. In light of defendants' efforts to conceal the Anthem problems, investors were shocked when, on January 12, 2016, Anthem publicly threatened to terminate its relationship with the Company. In particular, Anthem stated that it was entitled to lower pharmaceutical pricing that

equated to an annual savings on drug costs of more than $3 billion, which equated to $13 billion over the remaining term of the Agreement.  Anthem also stated that if Express Scripts refused to negotiate, Anthem would seek out another PBM partner.

11.     The public revelations of the nearly year-long beef between Anthem and Express Scripts caused Express Scripts' stock price to plummet $5.89 per share, or nearly 7%, representing a $3.9 billion loss in market capitalization on January 13, 2016.

12.     Defendants thereafter attempted to mitigate the negative impact of this unfavorable news by continuing to misleadingly reassure investors that the Company was in full compliance with the terms of the Anthem Agreement.  In its Annual Report on Form 10-K for the year ended December 31, 2015, filed with the SEC on February 16, 2016 (the "2015 Form 10-K"), Express Scripts downplayed the pricing review negotiations with Anthem, stating that it was engaged in good-faith discussions.  Shortly thereafter, in an investor conference call on February 17, 2016, Express Scripts officials again assured investors that the Company was performing at a high level, financially and operationally, and that it remained committed to reaching a mutually beneficial agreement with Anthem.  Express Scripts had, in reality, been entirely ignoring Anthem's repeated notices of breach and was making no attempt to resolve or mitigate these contractual breaches.

13.     Just one month after Express Scripts assured investors that it was in compliance with the Agreement's terms, on March 21, 2016, Anthem filed suit against the Company in the U.S. District Court for the Southern District of New York, alleging that Express Scripts breached its contract with Anthem by failing to negotiate pricing terms in good faith (the "Anthem Complaint"). The Anthem Complaint also alleges that Express Scripts materially breached its obligation to perform operational duties in a "prudent and expert manner," as required by the contract, and in so doing violated CMS rules and regulations.

- 4 -

14.     As a result of defendants' improper conduct, the Anthem Complaint seeks almost $15 billion in damages and a release from its contract with Express Scripts.  Further, as a direct result of this unlawful course of conduct, the Company is now the subject of an expensive-to-defend federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York on behalf of investors who purchased Express Scripts' shares (the "Securities Class Action").

## JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. §1332(a)(1).  Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) one or more of the defendants either reside(s) in or maintain(s) offices in this District; and (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

**Plaintiffs**

18.     Plaintiffs M. Scott Brewer, James E. Brown, Sr., Marcus Estlack, Keith McClanahan, Jeremy Jeffers, Glenn Jeffries, William Waterkotte, Andrew Wiseman, Denzil Malone and Gary R. Reed are the Trustees of the Carpenters Pension Fund of West Virginia ("Carpenters Pension Fund") and each of them pursues this action in that capacity.  Each of the Trustees are citizens of the State of West Virginia.

19.     The Carpenters Pension Fund is a pension fund authorized by the Taft-Hartley Act of 1947 and administered by its Board of Trustees.  The Carpenters Pension Fund is and has been a shareholder of Express Scripts since at least November 2009.

**Nominal Defendant**

20.     Nominal defendant Express Scripts is a Delaware corporation with principal executive offices located at One Express Way, St. Louis, Missouri.  According to its SEC filings, Express Scripts is a PBM company that provides, among other things, products and solutions to improve patient outcomes and assist in controlling costs.  Express Scripts is a citizen of the State of Delaware and Missouri.

**Director Defendants**

21.     Defendant Maura C. Breen has been a director of Express Scripts since July 2004. She has also served as Chair of the Compensation Committee of the Express Scripts Board. Defendant Breen knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Breen also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  On information and belief, Breen is a citizen of the State of Florida or Massachusetts.

22.     Defendant William J. DeLaney has been a director of Express Scripts since September 2011.  He has also served on the Audit Committee and Compensation Committee of the Express Scripts Board.  Defendant DeLaney knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the

Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant DeLaney also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  DeLaney is a citizen of the State of Texas.

23.     Defendant Elder Granger has been a director of Express Scripts since May 2015.  He has also served on the Compliance Committee of the Express Scripts Board.  Defendant Granger knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Granger also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Granger is a citizen of the State of Colorado.

24.     Defendant Nicholas J. LaHowchic has been a director of Express Scripts since July 2001.  He has also served on the Audit Committee and the Compensation Committee of the Express Scripts Board.  Defendant LaHowchic knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant

LaHowchic also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  LaHowchic is a citizen of the State of Florida.

25.     Defendant Thomas P. Mac Mahon has been a director of Express Scripts since March 2001.  Defendant Mac Mahon knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Mac Mahon also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  On information and  belief, Mac Mahon is a citizen of the State of New Jersey or Florida.

26.     Defendant Frank Mergenthaler has been a director of Express Scripts since January 2009.  He has also served as the Chair of the Audit Committee of the Express Scripts Board. Defendant Mergenthaler knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first quarter through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Mergenthaler also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Mergenthaler is a citizen of the State of New Jersey.

27.     Defendant Woodrow A. Myers, Jr. has been a director of Express Scripts since May 2007.  He has also served on the Compensation Committee and Compliance Committee of the Express Scripts Board.  Defendant Myers knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Myers also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Myers is a citizen of the State of Indiana.

28.     Defendant Roderick A. Palmore has been a director of Express Scripts since September 2014.  He knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Palmore also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Palmore is a citizen of the State of Illinois.

29.     Defendant George Paz has been a director of Express Scripts since January 2004.  He also served as CEO of Express Scripts from April 2005 to May 2016, as President from October 2003 to February 2014, and as Senior Vice President and Chief Financial Officer from January 1998 to April 2004.  Defendant Paz is named in the Securities Class Action complaint that alleges he

violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Defendant Paz knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the  Company of issues related to  its  most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Paz also knowingly, recklessly, or with gross negligence caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Paz is a citizen of the State of Missouri.

30.     Defendant William L. Roper has been a director of Express Scripts since April 2012. He also has served as the Chair of the Compliance Committee of the Express Scripts Board. Defendant Roper knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Roper also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem. Roper is a citizen of the State of North Carolina.

31.     Defendant Seymour Sternberg has been a director of Express Scripts since March 1992.  He has also served on the Audit Committee of the Express Scripts Board.  Defendant Sternberg knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first

through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Sternberg also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Sternberg is a citizen of the State of New York.

**Officer Defendants**

32.     Defendant Christopher A. McGinnis has been Express Script's Vice President, Chief Accounting Officer, and Controller since September 2015.  He previously served as Vice President of Finance and Investor Relations from August 2014 to August 2015, as Vice President, Legal and Business Development from April 2012 to July 2014, and as Assistant General Counsel from April 2010 to April 2012.  Defendant McGinnis has served in other roles with the Company since joining in March 2008.  He knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant McGinnis also knowingly, recklessly, or with gross negligence caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  McGinnis is a citizen of the State of Missouri.

33.     Defendant David Queller has been Express Scripts' Senior Vice President of Sales and Account Management since July 2014.  He knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016;

and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Queller also knowingly, recklessly, or with gross negligence caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Defendant Queller is also named in the Securities Class Action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act.  Queller is a citizen of the State of Missouri.

34.     Defendant Eric R. Slusser has been Express Scripts' Executive Vice President and Chief Financial Officer since September 2015.  He knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Slusser also knowingly, recklessly, or with gross negligence caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Defendant Slusser is also named in the Securities Class Action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act.  Slusser is a citizen of the State of Missouri.

35.     Defendant Wentworth has been Express Scripts' CEO and President since May 2016 and February 2014, respectively.  Defendant Wentworth has been an Express Scripts director since June 2015.  Defendant Wentworth was also Express Scripts' Senior Vice President of Sales and Account Management from April 2012 to February 2014.  Defendant Wentworth knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases,

investor conference calls, and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Wentworth also knowingly, recklessly, or with gross negligence caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Defendant Wentworth is also named as a defendant in the Securities Class Action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act. Wentworth is a citizen of the State of Missouri.

**Former Director and Officer Defendants**

36.    Defendant Gary G. Benanav served as a director of Express Scripts from January 2000 to May 2016.  He knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.   Defendant Benanav also knowingly or recklessly caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  On information and belief, Benanav is a citizen of the State of New York or Connecticut.

37.    Defendant James M. Havel was Express Scripts' Executive Vice President of Finance from September 2015 until March 2016.  He was Express Scripts' Executive Vice President and Interim Chief Financial Officer from January 2015 to September 2015.  Defendant Havel knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full

year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Havel also knowingly, recklessly, or with gross negligence caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Defendant Havel is also named in the Securities Class Action complaint that alleges he violated §§10(b) and 20(a) of the Exchange Act.  Havel is a citizen of the State of Missouri.

38.     Defendant Christopher K. Knibb served as Vice President and Chief Accounting Officer of Express Scripts from February 2013 to September 2015, and as Vice President Financial Planning and Analysis from September 2015 to 2016.  He knowingly or recklessly approved and allowed improper statements in the Company's press releases and public filings concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Defendant Knibb also knowingly or recklessly or with gross negligence caused or allowed the Company to fail to negotiate its largest contract with its most important client in good faith, and fail to adhere to critical contractual obligations with Anthem.  Knibb is a citizen of the State of Missouri.

**FIDUCIARY DUTIES DEFENDANTS OWED TO EXPRESS SCRIPTS**

39.     By reason of their positions as officers, directors and/or fiduciaries of Express Scripts and because of their ability to control the business and corporate affairs of Express Scripts, defendants owe Express Scripts and its shareholders a fiduciary duty of loyalty and care, and are required to use their utmost ability to control and manage Express Scripts in an honest and lawful manner.  Defendants are required to act in furtherance of the best interests of Express Scripts and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

40.     Each officer and director of the Company owes to Express Scripts and its shareholders the fiduciary duty to exercise good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.  Each officer and director of Express Scripts had the duty and obligation to ensure the Company operated in compliance with all applicable laws and regulations, including, but not limited to, the federal securities laws.

41.     By reason of their positions as Express Scripts' officers and directors and because of their ability to control Express Scripts' business and corporate affairs, the defendants owed Express Scripts and its shareholders fiduciary obligations of trust, loyalty, good faith and due care and were required to use their utmost ability to control and manage Express Scripts in a fair, just, honest and equitable manner.  Defendants were required to act in furtherance of the best interests of Express Scripts and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

42.     Each defendant, as a director and/or officer of Express Scripts, owes to Express Scripts and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of fair dealing, in the administration of Express Scripts' affairs and in the use and preservation of its property and assets.

43.     Defendants, because of their positions of control and authority as directors and officers of Express Scripts, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.     To discharge their duties, the defendants, as Express Scripts' officers and/or directors, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, defendants were required to, among other things: (i) ensure that Express Scripts was operated in a diligent, honest and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of Delaware and the United States; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of Express Scripts' business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (iii) fully inform themselves as to how Express Scripts conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; (iv) establish and maintain systematic and accurate records and reports of the business and internal affairs of Express Scripts and procedures for the reporting of the business and internal affairs and to periodically investigate, or cause independent investigation to be made of, said reports and records; (v) maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Express Scripts' operations and financial statements comply with all laws; (vi) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and (vii) examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of the Company and to make full and

accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

45.     Each defendant, by virtue of his or her position as a director or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  Defendants' misconduct complained of herein involves a knowing and culpable violation of their obligations as Express Scripts' directors and officers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders, which the defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of defendants who were officers of the Company has been ratified by the remaining defendants who collectively comprised Express Scripts' Board at all relevant times.

46.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Defendants' conduct in causing the Company to make misrepresentations and omissions during the relevant period violated these specific requirements and obligations.  Accordingly, the defendants breached their fiduciary duties, including their duties of good faith, candor and loyalty.

47.     Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company.  By virtue of such duties, defendants were required to, among other things: (i) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls; (iv) remain fully informed as to how Express Scripts conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with securities laws; (v) ensure that Express Scripts was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations; and (vi) refrain from breaching their duty of loyalty to the Company to benefit themselves at the expense of the Company.

48.     At all times relevant hereto, the defendants were the agents of each other and were at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breaching their respective duties.

- 18 -

50.     During all times relevant hereto, defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Express Scripts, regarding defendants' management of Express Scripts' operations; (ii) cause the Company to make improper statements in its press releases and public filings concerning its financial results and financial guidance; (iii) conceal the impact on the Company of issues related to its most important client, Anthem, in turn creating a significant risk that the Company would lose Anthem's business; and (iv) enhance defendants' executive and directorial positions at Express Scripts and the profits, power and prestige defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, defendants, collectively and individually, took the actions set forth herein.

51.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time, defendants caused the Company to issue improper financial statements.

52.     The purpose and effect of defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise defendants' violations of law, breaches of fiduciary duty and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

53.     Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the

wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

55.     Express Scripts is the largest independent PBM company in the United States.  As a PBM, Express Scripts administers the prescription drug benefit component of its customers' health insurance plans.  Express Scripts also negotiates drug prices with pharmacies and establishes a network of pharmacies through which patients can fill their prescriptions.  As part of its PBM services, the Company provides Medicare Part D-related products and services to Medicare Part D plan sponsors.[1]  The Company's PBM services accounted for over 97% of its revenues over the past three years.

56.     According to the Company's 2015 Form 10-K, Express Scripts operates in a highly competitive industry, where a substantial portion of its business is concentrated in certain significant client contracts.  The 2015 Form 10-K further provides that the Company's ability to remain profitable in the marketplace depends on its continued ability to attract and retain clients.  Notably, the Company's larger clients typically seek competing bids from its competitors prior to contract expiration, and can easily move between Express Scripts and its competitors, potentially making it difficult for the Company to retain existing clients.  It is therefore crucial for the Company to resolve any issues that may arise under these key client contracts.  The negative reputational impact of a significant event, including a failure to execute on client contracts, could affect the Company's ability to grow and retain profitable clients, which could have a material adverse effect on its business and results of operations.

---

[1]     Enacted on January 1, 2006, Medicare Part D is a stand-alone federal program designed to subsidize the costs of prescription drugs for Medicare beneficiaries in the United States.

57.     In December 2009, Express Scripts acquired certain subsidiaries of Anthem that provided PBM services.  In conjunction with the acquisition, Express Scripts entered into the 10-year Agreement under which it would provide PBM services to members of the affiliated health plans of Anthem.  Express Scripts then integrated Anthem's former PBM clients into Express Scripts' systems and operations.  As a result of that contract, Anthem, one of the largest health benefits companies in the United States, became Express Scripts' most important client.  Anthem is Express Scripts' largest client, alone representing approximately 14% of Express Scripts' annual revenues.  Accordingly, the Company's relationship with Anthem and its ability to provide Anthem with high quality service is of paramount importance to investors.

58.     As was recently revealed in the Anthem Complaint and detailed below, by no later than February 16, 2015,  Anthem began repeatedly notifying Express Scripts that the Company was failing to perform under the terms of the Agreement for a number of specified reasons and that Anthem consequently had the right to terminate the Agreement on that basis.  Nonetheless, throughout 2015 and the first quarter of 2016, defendants repeatedly assured investors that Express Scripts' relationship with Anthem remained strong and that it was providing Anthem, and all of its customers, with high quality service.  At the same time, defendants also misleadingly touted that the Company was performing at a high level, financially and operationally.

## EXPRESS SCRIPTS' AGREEMENT WITH ANTHEM

59.     Anthem and Express Scripts are parties to the Agreement under which Express Scripts serves as the exclusive provider of PBM services for health insurance plans administered and insured by Anthem's affiliated health plans for a 10-year period from 2009 through 2019, unless terminated earlier.  Pursuant to the Agreement, Express Scripts is and was subject to certain pricing provisions, as well as operational provisions, as detailed below.

60.     The Agreement contains a "Periodic Pricing Review" provision that provides for repricing at specified intervals "to negotiate in good faith" in order to "ensure that [Anthem] is receiving competitive benchmark pricing."  Given the Agreement's 10-year term and that the cost of drugs is a key driver in the health insurance industry, this provision ensured that Express Scripts' pricing over time to Anthem was competitive in the marketplace.  The Agreement further detailed that in the event Anthem or its third-party consultant determined that such pricing terms were not competitive, Anthem would have the ability to propose renegotiated pricing terms to Express Scripts and Express Scripts agreed to negotiate in good faith over the proposed new pricing terms.

61.     The Agreement also contains a provision that requires Express Scripts to perform services under the Agreement "in a prudent and expert manner in accordance with this Agreement and all laws."   Among its several obligations, Express Scripts was obligated to review prior authorization requests for certain prescription drugs in accordance with formulary and clinical guidelines ("Defined Criteria").  Secondly, Express Scripts was required to perform its Medicare Part D functions in accordance with Medicare regulations and CMS instructions.  Indeed, CMS requires sponsors of Medicare Part D prescription drug plans, such as Anthem, to submit to CMS a data file containing information with respect to each claim for a prescription drug paid by the sponsor under the given plan, also known as PDE data.  Pursuant to the Agreement, Express Scripts is and was responsible for collecting, creating and submitting PDE files to CMS within the appropriate timeframe.  In essence, Express Scripts is responsible for collecting, creating and submitting PDE data in the format and timeframe specified by CMS.  Thirdly, Express Scripts was obligated to satisfy CMS mandated TATs with respect to processing Medicare Part D claims.  Specifically, the Company was required to expeditiously investigate and review submitted claims for eligibility and what amount, if any, was payable; provide notification as to the disposition of such

claims; and request such further information as was needed to complete the claim.  CMS's Medicare Part D rules also require coverage determinations to be processed within specified timeframes, and upon any failure to do so, the applicable case must be automatically forwarded to a CMS-designated Independent Review Entity ("IRE").

## DEFENDANTS MISREPRESENTED EXPRESS SCRIPTS' PURPORTEDLY STRONG RELATIONSHIP WITH ANTHEM

62.     According to the Anthem Complaint, Express Scripts began breaching its operational obligations pursuant to the Agreement in early 2014, by failing to satisfy CMS mandated TATs with respect to processing Medicare Part D claims.   As a result of Express Scripts' inadequate performance, on February 4, 2014, Anthem issued a corrective action plan for the Company's failure to process and provide notification of coverage determinations within the time periods specified by CMS.   Despite the corrective action plan, Express Scripts failed to implement an adequate information technology system to handle these claims, which resulted in the submission of many cases to a CMS-designated IRE for determination.  Anthem alleged that these operational breaches were pervasive and were attributable to systemic defects in Express Scripts' information technology infrastructure, failure to devote sufficient resources to its obligations, inadequate training of its personnel, inordinately high turnover and a lack of necessary expertise.

63.     One year after being notified of the Company's contractual failures, defendants were again put on notice of those contractual breaches on February 16, 2015, when Anthem sent Express Scripts a formal notice of breach of the Agreement due to the Company's failure to perform its operational obligations under the Agreement.   Anthem further informed the Company that it consequently had the right to terminate the Agreement.

64.     On February 23, 2015, just one week after Express Scripts received its first formal notice of default from Anthem, Express Scripts filed with the SEC its Annual Report on Form 10-K

for the year ended December 31, 2014 (the "2014 Form 10-K").  The 2014 Form 10-K was signed by defendants Paz, Havel, Knibb, Benanav, Breen, DeLaney, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper and Sternberg.  While the 2014 Form 10-K acknowledged that the Company's financial results would be materially adversely affected if a large client changed the terms of a contract, it failed to acknowledge that this event was already currently occurring.  In relevant part, the 2014 Form 10-K stated:

> If one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected and we could experience a negative reaction in the investment community resulting in stock price declines or other adverse effects.

The 2014 Form 10-K also generally warned that "the administration of the Medicare Part D program is complex and any failure to effectively execute the provisions of the Medicare Part D program may have an adverse effect on our financial position."

65.     The 2014 Form 10-K failed to disclose, however, that at this time, Express Scripts was already failing to execute the operational provisions in the Agreement with Anthem related to Medicare Part D.  According to the Anthem Complaint, Express Scripts had failed to build a functional information technology system with the capacity to reprocess claims consistently, issue correct refunds to or collect from members, and resubmit accurate PDE records in accordance with CMS mandates.  This failure resulted in high volumes of PDE rejections, incorrect calculations being used by CMS for financial reconciliations, and compliance risk for non-adherence to CMS's PDE timeliness rules.  Not only did Express Scripts' failure to satisfy its contractual obligations place Anthem at risk for CMS enforcement actions, many of which carry negative financial and reputational consequences to Anthem's business, it further harmed Anthem by causing member abrasion and dissatisfaction.

66.     Despite their awareness of Express Scripts' contractual breaches to the Agreement, on February 25, 2015, defendants continued to make improper statements about the purported strength of the Company's relationship with Anthem in a conference call with analysts and investors.  During the conference call, defendant Queller stated: "[W]e've got a great relationship with Anthem. . . .  Our teams work together closely each and every day.  The relationship is very, very solid."  Although defendant Queller vaguely acknowledged the ongoing contract negotiations with Anthem, he did not provide any details, instead assuring investors that "we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well."

67.     According to the Anthem Complaint, in the following weeks, the parties attempted to reach a solution pursuant to a three-step dispute resolution process detailed in the Agreement.  The parties' Joint Pharmacy Operating Committee ("JPOC"), which had fifteen days to attempt to resolve the dispute, met on March 6, 2015, and again on April 15, 2015, but did not come to a resolution.

68.     As detailed in the Anthem Complaint, on March 18, 2015, Anthem notified Express Scripts that it had conducted a market analysis and had determined that the pricing terms contained in the Agreement were not competitive.  Anthem proposed new pricing terms and requested that Express Scripts provide Anthem, no later than March 30, 2015, either confirmation that the pricing terms constituted competitive market pricing or alternative pricing terms that Express Scripts in good faith proposed as competitive benchmark pricing.  Express Scripts provided neither.

69.     The Anthem Complaint also reveals that on April 1, 2015, Anthem provided Express Scripts with another formal notice of breach, this time detailing the Company's breaches related to the Agreement's pricing provisions.  Anthem stated that the Company was repudiating its

obligations by claiming that it did not have to negotiate for competitive benchmark pricing and that it had a veto right over any negotiations. Express Scripts continued to refuse to negotiate at all, failed to agree in writing to new pricing terms, and failed to make any proposal for competitive benchmark pricing.

70.     On April 28, 2015, less than a month after receiving the second formal notice of breach from Anthem, defendants caused or allowed Express Scripts to tout its ability to retain clients in a press release in which it announced its financial results for the first quarter ended March 31, 2015. In the press release, defendant Wentworth highlighted that the quality of the Company's product offerings drove client retention, stating, "'Our model . . . is embedded in our innovative solutions that are clearly differentiated and in high demand.'"

71.     That same day, Express Scripts reiterated the financial results in its Quarterly Report on Form 10-Q for the first quarter of 2015, filed with the SEC. The Form 10-Q was signed by defendants Paz and Havel, both of whom attested to the purported accuracy and completeness of the Form 10-Q. In the Form 10-Q, the Company incorporated by reference the general risk warnings included in 2014 Form 10-K. Still, the Company failed to mention that it was already experiencing these risks.

72.     On April 29, 2015, Express Scripts held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, defendant Paz again painted the Company's relationship with Anthem in a positive light, stating that "Anthem is an incredibly important client to us. And I think we do very good things together." Defendant Paz elaborated further, noting that Express Scripts "really enjoy[s] that relationship" and "really enjoy[s] providing services to their members." In contrast to these positive statements, Express Scripts and Anthem were making no progress in their contract negotiations to the Agreement, the relationship

- 26 -

between the two companies was in serious jeopardy, and Anthem had already notified Express Scripts' on multiple occasions that the Company had breached the pricing provisions and operational provisions of the Agreement.

73.    As disclosed in the Anthem Complaint, pursuant to the dispute resolution clause in the Agreement, the parties thereafter underwent step two of the three-step process.  Specifically, the Presidents of Anthem and Express Scripts met on May 27, 2015, but failed to resolve the dispute at the time.

74.    As the dispute with Anthem continued, Express Scripts continued to make improper statements about its strong client relationships in its July 28, 2015 press release, which announced its financial results for the second quarter ended June 30, 2015.  In the press release, defendant Paz stated that the Company's "'business model [is] fully aligned with client needs'" and is "'focused on our clients' best interests.'"  Defendant Paz further stated that "'Express Scripts is well positioned to serve clients through focused scale, alignment and innovative solutions which will drive value and earnings growth in the future.'"  Defendant Wentworth further elaborated, stating, "'We are proud of the relationships we have built with clients . . . who are more interested than ever in what Express Scripts can do for them and their members.'"  No mention was made of the Company's inability to resolve its ongoing dispute with Anthem.

75.    That same day, Express Scripts filed its Quarterly Report on Form 10-Q for the second quarter of 2015 with the SEC, reiterating the financial results in the press release.  The Form 10-Q was signed by defendants Paz and Havel, both of whom attested to the purported accuracy and completeness of the Form 10-Q.  In the Form 10-Q, Express Scripts again incorporated by reference the general warnings included in 2014 Form 10-K.  The Company continued to omit that such risks related to its key client contract with Anthem had already occurred.

76.     On July 29, 2015, Express Scripts held an earnings conference call with analysts and investors during which defendants continued to evade and sidestep the Company's issues with Anthem.  During the conference call, defendant Wentworth touted the Company's strong client retention rate, stating that Express Scripts' "performance to date and the positive feedback we continue to receive gives us confidence that we will have strong retention across the board." Defendant Wentworth also stated that the Company's "business outlook remains strong and our momentum continues" and touted the Company's "close collaboration with our clients."  As Express Scripts continued to boast about its solid client relationships, investors remained unaware of the Company's struggles with Anthem, its largest and most important client.

77.     According to the Anthem Complaint, Express Scripts continued to violate the operational provisions of the Agreement.  Express Scripts agreed to a corrective action plan on August 26, 2015, but the violations persisted.  Anthem discovered that Express Scripts did not have an automated process for Medicare claims and that its current process lacked adequate internal controls.  Notably, Medicare Part D plan members were denied reimbursement inappropriately, did not receive the CMS-required notice of the plan's decision on their reimbursement request, and were not given CMS-required appeal rights.

78.     On October 27, 2015, the Company discussed its expectations regarding client retention in a press release that announced its financial results for the third quarter ended September 30, 2015.  Specifically, defendant Wentworth stated that the Company was "'confident in the upper range of our expected retention rate, a reflection of the trust clients have in Express Scripts.'" Defendant Wentworth also boasted that the Company's "'unique collection of cost-saving solutions and our business model of client alignment position us well for continued growth.'"  Defendant

Wentworth projected an increasing retention rate, despite the fact that the Company was in jeopardy of losing business with its largest client.

79.     That same day, Express Scripts filed with the SEC its Quarterly Report on Form 10-Q for the third quarter of 2015, reiterating the financial results from its press release.  The Form 10-Q was signed by defendants Paz and Slusser and contained certifications by defendants Paz and Slusser that attested to the purported accuracy and completeness of the Form 10-Q.  In the Form 10-Q, the Company incorporated by reference the general warnings included in 2014 Form 10-K.  Express Scripts continued to omit that such risks had already materialized.

80.     Express Scripts held a conference call with analysts and investors on October 28, 2015, to discuss the Company's earnings and operations.  During the conference call, defendant Wentworth yet again elaborated on Express Scripts' purported strong relationship with its clients. Specifically, defendant Wentworth stated that, "[b]ased on our results this year, we are confident about next year's selling and retention season."  Defendant Wentworth also emphasized that, among other things, the Company's "strong client relationships position [it] well for 2016," and that Express Scripts "will keep [its] clients and patients in the center of everything" it does.  At this point, Express Scripts' relationship with Anthem was in shambles, yet no mention of this problem was made during the conference call.

81.     As noted in the Anthem Complaint, in a final attempt to resolve the dispute, the parties initiated step three of the three-step dispute resolution process.  On November 9, 2015, Anthem and Express Scripts underwent mediation to no avail.  The dispute resolution process was therefore exhausted, and the parties were no closer to a resolution than they were nearly nine months ago when Anthem first notified Express Scripts of its contractual breaches to the Agreement.

82.     On December 22, 2015, Express Scripts addressed its ongoing pricing negotiations with Anthem in a conference call with analysts and investors.  During the conference call, defendant Paz assured investors that Express Scripts was "fully committed to reaching a mutually beneficial agreement, and continuing our successful working relationship."  Defendant Paz also stated that "[s]ince 2009, we have delivered quality care for Anthem's members."  Lastly, defendant Paz stated that discussions with Anthem were "very early on" and that the Company believed that there was a great opportunity for it to work with Anthem towards a mutually beneficial arrangement.  At this point, however, the parties had undergone all phases of the dispute resolution process and had come no closer to reaching such mutually beneficial arrangement.

83.     The Anthem Complaint notes that nearly one year after Anthem brought these issues to the attention of Express Scripts, on January 7, 2016, Express Scripts forwarded a proposal that would reduce pricing by only $1 billion, a mere 8% of what Anthem stated it was entitled to receive under the Agreement.  When Anthem responded to this proposal, advising Express Scripts that it would be willing to accept less than competitive benchmark pricing to resolve the issue, Express Scripts did not respond.  Representatives of Anthem then traveled to St. Louis on February 3, 2016, to meet with defendant Wentworth, but the meeting was not productive.  Express Scripts maintained its position that it was not obligated to negotiate, and Anthem offered to accept a pricing reduction of only $9.7 billion, over term, which was $3.4 billion less than what Anthem was entitled to receive, in order to resolve the dispute without litigation.  Express Scripts responded by reiterating its January 7, 2016 proposal, which amounted to $12 billion in excess of competitive benchmark pricing.  Express Scripts' officials refused to come to an agreement and, in so doing, put the Company in jeopardy of losing its largest client.

84.     According to the Anthem Complaint, on February 12, 2016, Express Scripts responded with a proposal that did not reduce pricing by a single dollar from its January 7, 2016 proposal.  Anthem again expressed to the Company that Express Scripts' refusal to negotiate was in bad faith.

85.     On March 1, 2016, Anthem's CEO traveled to Chicago to meet with defendant Paz to negotiate, again to no avail.  Express Scripts continued to refuse to negotiate at all over the pricing terms proposed by Anthem for competitive benchmark pricing.  This fruitless exchange had now been transpiring for nearly a full year, and on March 17, 2016, Express Scripts responded with a refusal to update its February 12, 2016 proposal.  Throughout these fruitless exchanges, Express Scripts' investors were oblivious to the fact that the Company was in serious danger of losing its largest source of revenue.

## THE TRUTH EMERGES

86.     Defendants' unlawful scheme continued unabated until early 2016.  Then, beginning on January 12, 2016, the truth began to emerge.  On January 12, 2016, Anthem publicly threatened to terminate its relationship with Express Scripts unless the Company would renegotiate its Agreement with Anthem to deliver significant savings on drug costs.  Anthem's CEO, Joseph Swedish, stated that Anthem was entitled to lower pharmaceutical pricing that equates to an annual savings of more than $3 billion.  Mr. Swedish also stated that if Express Scripts remained unwilling to renegotiate drug pricing, Anthem would look for another PBM partner that could give it better prices.  Further, Thomas Zielinski, Anthem's general counsel, stated that the dispute resolution process in the Agreement had been fully exhausted, indicating little time remained for the companies to arrive at a solution.  Both the scale of the pricing concessions Anthem was seeking and the threat to terminate the Express Scripts relationship provided investors with the first indication that relations between the two companies had seriously declined during contract negotiations, and that Express

Scripts risked losing Anthem's business.  As a result of these disclosures by Anthem, on January 13, 2016, the price of Express Scripts' shares fell $5.89 per share, representing a $3.9 billion loss in market capitalization.

87.     Faced with Anthem's threat to terminate its relationship with Express Scripts, defendants continued to mislead the investing public by claiming that they and the Company acted in good faith and were in full compliance with the terms of the Agreement with Anthem.  On February 16, 2016, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2015.  In the press release, defendant Wentworth stated that 2015 was the Company's "'strongest retention year ever'" and that "'Express Scripts has momentum that maintains our confidence in our 2016 guidance and justifies our excitement about our future.'"  Defendant Wentworth also stated that the Company was "'well positioned to drive growth and deliver value to clients and shareholders.'"  These misrepresentations wrongfully assured investors that the Company was in a stable position when, in fact, it was in jeopardy of losing its largest client, or 14% of its revenue.

88.     That same day, the Company filed its 2015 Form 10-K.  The 2015 Form 10-K was signed by defendants Paz, Wentworth, Slusser, McGinnis, Benanav, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper and Sternberg, each of whom reviewed and approved issuance of the 2015 Form 10-K.  In 2015 Form 10-K, the Company again warned that:

> If one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms  less favorable to us, our financial results could be materially adversely affected and we could experience a negative reaction in the investment community resulting in stock price declines or other adverse effects.

However, the Company did not provide detail on the true deteriorating state of its relationship with Anthem.

89.     Rather, in the 2015 Form 10-K, the Company downplayed the pricing review negotiations with Anthem.  Specifically, Express Scripts misleadingly stated that it was "actively engaged in good faith discussions with Anthem and intend[s] to continue to comply with the requirements of the agreement."

90.     In the 2015 Form 10-K, the Company again generally warned that "[t]he administration of Medicare Part D is complex and any failure to effectively execute the provisions of Medicare Part D may have an adverse effect on our business and our results of operations."  The Company omitted that such risks had already materialized approximately one year earlier.

91.     Express Scripts held a conference call with analysts and investors on February 17, 2016, during which Company officials implemented damage control related to Anthem's public comments concerning the pending contract negotiations to the Agreement.  During the conference call, defendant Paz assured investors that Express Scripts was "performing at a high level financially and operationally" and that "[o]ur team is delivering great service to Anthem and its members." Defendant Paz also stated that the Company "remain[ed] fully committed to good faith negotiations in hopes of reaching a mutually beneficial agreement within the framework of our 2009 contract." In addition, defendant Paz again attempted to quell investor concern about the ongoing price check, noting that the pricing negotiations are "pretty routine" and that the Company conducts "bunches of those, every year."

92.     The contract negotiations between Anthem and Express Scripts failed greatly, and on March 21, 2016, Anthem sued Express Scripts, alleging that the Company breached its contract with Anthem by failing perform operational duties in a "prudent and expert manner" and failing to

negotiate pricing terms in good faith.  As a result, Anthem is seeking $15 billion in damages and to be released from its obligations in its contract with Express Scripts.

93.     This most recent news caused another $1.2 billion fall in Express Scripts' market capitalization.  Between January 1, 2016, and March 22, 2016, the Company's market capitalization fell nearly $12.8 billion, or approximately 22%.

94.     Analysts were surprised by Anthem's allegations and immediately questioned whether Express Scripts had adequately disclosed the precariousness of the Company's relationship with Anthem.  For example, analysts at Leerink Partners stated that the Company was "under-estimating [Anthem's] desire and willingness to walk away from their contract."  The Leerink Partners analysts also stated that the Company's relationship with Anthem "has deteriorated to a point where the most likely outcome is termination of the contract either before or at the 2019 end-date."

95.     Analysts at Deutsche Bank Markets Research agreed that Express Scripts was over-charging Anthem, stating that Anthem could be overpaying Express Scripts by more than $7.50 per script, or more than $1.35 billion versus the prevailing market rate today.  This figure could be significantly higher if Anthem's rate in 2012 was not set to the prevailing market rate at the time, or if Anthem's script count was higher than analyst estimates.  The analysts further estimated that Express Scripts could be generating excess unshared rebates in the $600 million to $650 million range.  Deutsche Bank Markets Research analysts further stated that they believed Express Scripts over-earns on the contract, likely close to $2 billion.  In addition, in a Morningstar Equity Analyst Report, analysts stated that they believed Express Scripts will need to concede a certain amount of current economics to Anthem for the contract renewal.

96.     In truth, defendants' positive statements were false when made because they failed to disclose and misrepresented the following material adverse facts that defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     the Company was experiencing known but undisclosed issues related to contract negotiations with its largest and most important client, Anthem;

(b)     Anthem had already served the Company with multiple notices of default;

(c)     these issues created a significant risk that the Company would lose Anthem's business; and

(d)     as a result of the foregoing, defendants' representations concerning Express Scripts' relationship with its largest customer were inaccurate and misleading, as were the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016.

## DAMAGES TO EXPRESS SCRIPTS

97.     Express Scripts has been severely damaged.  As a result of defendants' faithless acts, the Company disseminated improper public statements concerning: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016; and (ii) the impact on the Company of issues related to its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  These improper statements have devastated Express Scripts' credibility as reflected by the Company's almost $12.8 billion, or 22%, market capitalization loss.

98.     Express Scripts' performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Express Scripts' current and potential customers also consider a company's ability to comply with its contractual obligations and to accurately value its business prospects and evaluate growth potential and perform on client contracts.

Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions and that are unable to perform on contracts.  Express Scripts' ability to attract and retain potential customers is now impaired.

99.     In addition, Express Scripts may be liable for potential damages related to the CMS violations that occurred as a result of the operational breaches pursuant to the Agreement and may have lost its most important client.

100.    Further, as a direct and proximate result of defendants' actions, Express Scripts has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from defending and paying any settlement in the action brought by Anthem; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Express Scripts.

## DERIVATIVE ALLEGATIONS

101.    Plaintiffs incorporate ¶¶1-100.

102.    Express Scripts is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiffs will adequately and fairly represent the interests of Express Scripts in the derivative claims.

103.    The Express Scripts' Board has twelve members.  They are defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth.  Plaintiffs have not made a pre-suit demand on the Express Scripts Board to institute this action, because such a demand would be a futile and useless act, and therefore, is excused.

104.    First defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth breached their fiduciary duties of loyalty by making, approving, or allowing the Company to make improper statements in its press releases and public filings concerning the Company's deteriorating relationship with Anthem as well as its financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016. These defendants repeatedly made, approved, or allowed these improper statements for well over a year while at the same time the Company was receiving repeated breach of contract notifications from Anthem, the Company's largest and most important customer.

105.    Second defendants Sternberg, LaHowchic, Mergenthaler and DeLaney, as members of the Audit Committee, reviewed and approved the improper statements. Despite their knowledge or reckless disregard of the impropriety of the statements, these Audit Committee members approved their dissemination. Accordingly, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

106.    Third, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney were required to "discuss with management . . . the Company's major financial risk exposures," and thus knew or should have known about the significant issues the Company was experiencing related to its contract negotiations with Anthem and the challenges to its financial results for 2014 and the first through fourth quarters and full year 2015, and to its financial guidance for 2016. Despite their knowledge or reckless disregard, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney caused these improper statements to be made. Accordingly, defendants Sternberg, LaHowchic, Mergenthaler and

DeLaney breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

107.    Fourth, defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth had the responsibility to ensure the Company engaged in good-faith contract negotiations with its largest and most important client, Anthem.  As the Company's most important client and the source of 14% of the Company's revenues, Anthem was vital to the stability and profitability of the Company.  Despite repeated notifications and requests from Anthem, these defendants did not ensure that the Company negotiated in good faith.  Defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth also failed to disclose to the public that the Company was in jeopardy of losing this vital client due to their refusal to negotiate in good faith.   Therefore, defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth breached their fiduciary duties to the Company.  Accordingly, defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth face a substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

108.    Fifth, Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth were also responsible for ensuring the Company was complying with applicable laws and regulations, including CMS regulations, particularly with respect to performance under the Agreement.  Despite knowing that the Company's computer system was deficient for meeting CMS requirements, these defendants failed to take any meaningful

action to resolve the impacted records and resolve the deficiencies.  Therefore, defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth breached their fiduciary duties to the Company.  Accordingly, defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth face a substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

## COUNT I

### (Against All Defendants for Breach of Fiduciary Duty)

109.    Plaintiffs incorporate ¶¶1-108.

110.    Defendants owed and owe Express Scripts fiduciary obligations.  By reason of their fiduciary relationships, defendants owed and owe Express Scripts the highest obligation of good faith, fair dealing, loyalty and due care.

111.    Defendants and each of them, violated and breached their fiduciary duties of candor, good faith and loyalty.  More specifically, defendants violated their duty of good faith by making false and misleading statements concerning the Company's financial prospects and its relationship with Express Scripts' largest and most important customer.

112.    Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016, were overstated; and (ii) the Company was experiencing serious issues related to bad-faith contract negotiations with its most important client, Anthem, creating a significant risk that the Company would lose Anthem's business.  Accordingly, defendants breached their fiduciary duties to the Company.

113.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, Express Scripts has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

114.    Plaintiffs, on behalf of Express Scripts, have no adequate remedy at law.

## COUNT II

### (Against All Defendants for Unjust Enrichment)

115.    Plaintiffs incorporate ¶¶1-108.

116.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Express Scripts.  Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Express Scripts.

117.    Plaintiffs, on behalf of Express Scripts, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

118.    Plaintiffs, on behalf of Express Scripts, have no adequate remedy at law.

## COUNT III

### (Against All Defendants for Corporate Waste)

119.    Plaintiffs incorporate ¶¶1-108.

120.    By their wrongful acts and omissions, defendants wasted valuable corporate assets by, among other things, causing Express Scripts to pay improper compensation, bonuses and other benefits to certain Express Scripts executives who breached their fiduciary duties owed to Express Scripts and its shareholders.  Express Scripts received no benefit from these improper payments.  As a result, defendants damaged Express Scripts and are liable to the Company for corporate waste.

121.    Plaintiffs, on behalf of Express Scripts, have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on behalf of Express Scripts, demand judgment as follows:

A.      Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest;

B.      Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their misconduct, including all salaries, bonuses, fees and insider sales proceeds, and imposing a constructive trust thereon;

C.      Directing Express Scripts to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal securities laws and state corporation laws regarding fiduciary duties;

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  September 26, 2016           ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                     SAMUEL H. RUDMAN
                                     DAVID A. ROSENFELD


                                     _____
                                          SAMUEL H. RUDMAN

- 41 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

## VERIFICATION

I, M. Scott Brewer, on behalf of the Carpenters Pension Fund of West Virginia ("Carpenters Pension Fund"), hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment and Corporate Waste ("Complaint"), and that I have authorized for filing of the Complaint and that the foregoing is true and correct to the best of our knowledge, information and belief.

Executed this _6th_ day of September, 2016.

CARPENTERS PENSION FUND OF WEST VIRGINIA

By: _____

Title: _CHAIRMAN_____