USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 01/23/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

M. SCOTT BREWER, JAMES E. BROWN, SR., MARCUS ESTLACK, KEITH McCLANAHAN, JEREMY JEFFERS, GLENN JEFFRIES, WILLIAM WATERKOTTE, ANDREW WISEMAN, DENZIL MALONE and GARY R. REED, in their capacities as Trustees for the CARPENTERS PENSION FUND OF WEST VIRGINIA, derivatively on behalf of EXPRESS SCRIPTS HOLDING COMPANY

      Plaintiffs,

- against -

MAURA C. BREEN, WILLIAM J. DeLANEY, ELDER GRANGER, NICHOLAS J. LaHOWCHIC, THOMAS P. MAC MAHON, FRANK MERGENTHALER, WOODROW A. MYERS, JR., RODERICK A. PALMORE, GEORGE PAZ, WILLIAM L. ROPER, SEYMOUR STERNBERG, CHRISTOPHER A. McGINNIS, DAVID QUELLER, ERIC R. SLUSSER, TIMOTHY WENTWORTH, GARY G. BENANAV, JAMES M. HAVEL, and CHRISTOPHER K. KNIBB,

      Defendants,

- against -

EXPRESS SCRIPTS HOLDING COMPANY, a Delaware corporation,

      Nominal Defendant.

---

**OPINION AND ORDER**

16 Civ. 7500 (ER)

Ramos, D.J.:

  On September 26, 2016, trustees of the Carpenters Pension Fund of West Virginia brought this shareholder derivative action against nominal Defendant Express Scripts Holding

Company ("Express Scripts") and members of Express Scripts' Board of Directors and/or Express Scripts officers (the "Individual Defendants"), alleging breach of fiduciary duty, unjust enrichment, and corporate waste. Compl. (Doc. 1), ¶ 1. Defendants now move to dismiss, or in the alternative, to stay the action pending the related securities litigation currently before this court, *In re Express Scripts Holding Company Securities Litigation* (the "Securities Litigation"), 16 Civ. 3338 (S.D.N.Y. 2016) (Doc. 80).

I. BACKGROUND[1]

A. The Parties

Plaintiffs M. Scott Brewer, James E. Brown, Sr., Marcus Estlack, Keith McClanahan, Jeremy Jeffers, Glenn Jeffries, William Waterkotte, Andrew Wiseman, Denzil Malone, and Gary R. Reed are all trustees of the Carpenters Pension Fund of West Virginia (together, "Plaintiffs"). Compl. ¶ 18. The Carpenters Pension Fund has been a shareholder of Express Scripts since November 2009. *Id.* ¶ 19.

Nominal Defendant Express Scripts is the largest independent pharmacy benefits management ("PBM") company in the United States. *Id.* ¶ 55. As a PBM, Express Scripts administers prescription drug benefits, negotiates drug prices with pharmacies, and establishes networks of pharmacies through which beneficiaries can fill their prescriptions. *Id.* Express Scripts also provides products and services to Medicare Part D plan sponsors. *Id.*[2] Express Scripts' 2015 Form 10-K explained that a substantial portion of Express Scripts' business was

---

[1] The following facts are based on the allegations in the Complaint, which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] Medicare Part D is a federal program that subsidizes the costs of prescription drugs for Medicare beneficiaries. *Id.* ¶ 55 n.1.

2

concentrated in a few important client contracts and that its profitability as a company depended on its ability to attract and retain clients. *Id.* ¶ 56.

Thirteen of the Individual Defendants are current or former members of Express Scripts' Board of Directors: Seymour Sternberg (since March 1992);[3] Gary G. Benanv (from January 2000 to May 2016);[4] Thomas P. Mac Mahon (since March 2001);[5] Nicholas J. LaHowchic (since July 2001);[6] George Paz (since January 2004);[7] Maura C. Breen (since July 2004);[8] Woodrow A. Myers, Jr. (since May 2007);[9] Frank Mergenthaler (since July 2009);[10] William J. DeLaney (since September 2011);[11] William L. Roper (since April 2012);[12] Roderick A. Palmore (since September 2014);[13] Elder Granger (since May 2015);[14] and Timothy Wentworth (since June 2015).[15]

Seven of the Individual Defendants (including two who also served as Directors) were officers of Express Scripts. Defendant Paz was CEO of Express Scripts from April 2005 to May

---

[3] *Id.* ¶ 31. Defendant Sternberg has also served on the Audit Committee. *Id.*

[4] *Id.* ¶ 36.

[5] *Id.* ¶ 25.

[6] *Id.* ¶ 24. Defendant LaHowchic has also served on the Audit Committee and the Compensation Committee. *Id.*

[7] *Id.* ¶ 29. As discussed below, Defendant Paz was also an officer of Express Scripts.

[8] *Id.* ¶ 21. Defendant Breen has also served as the Chair of Express Scripts' Compensation Committee. *Id.*

[9] *Id.* ¶ 27. Defendant Myers has also served on the Compensation Committee and the Compliance Committee. *Id.*

[10] *Id.* ¶ 26. Defendant Mergenthaler has also served as the Chair of the Audit Committee. *Id.*

[11] *Id.* ¶ 22. Defendant DeLaney has also served on the Audit Committee and the Compensation Committee. *Id.*

[12] *Id.* ¶ 30. Defendant Roper has also served as the Chair of the Compliance Committee. *Id.*

[13] *Id.* ¶ 28.

[14] *Id.* ¶ 23. Defendant Granger has also served on the Compliance Committee. *Id*

[15] *Id.* ¶ 35. As discussed below, Defendant Wentworth was also an officer of Express Scripts.

2016. *Id.* ¶ 29.[16] Defendant Wentworth began serving as Express Scripts' President in February 2014, and its CEO in May 2016. *Id.* ¶ 35.[17] Defendant David Queller has been the Senior Vice President of Sales and Account Management for Express Scripts since July 2014. *Id.* ¶ 33. Defendant Eric R. Slusser is Express Scripts' Executive Vice President and Chief Financial Officer. *Id.* ¶ 34. He has served in that role since September 2015. *Id.* Defendant Christopher A. McGinnis has served as the Vice President, Chief Accounting Officer, and Controller since September 2015. *Id.* ¶ 32. Before that, he served as Vice President of Finance and Investor Relations. *Id.*[18] Defendant James M. Havel was Executive Vice President of Finance from September 2015 to March 2016. *Id.* ¶ 37. He also served as Executive Vice President and Interim Chief Financial Officer from January 2015 to September 2015. *Id.* Defendant Christopher K. Knibb served as Vice President of Financial Planning and Analysis from September 2015 to 2016. *Id.* ¶ 38. Prior to that, he was the Vice President and Chief Accounting Officer from February 2013 to September 2015. *Id.* Defendants Wentworth, Slusser, Queller, and Paz were also named as defendants in the Securities Litigation. *Id.* ¶¶ 29, 33–35.

**B.  Anthem and Express Scripts' 2009 PBM Agreement**

In 2009, Express Scripts entered into two agreements with Anthem, Inc. ("Anthem"), a health benefits company. *Id.* ¶ 57. First, Express Scripts acquired Anthem subsidiaries that performed PBM services for Anthem in-house. *Id.* Second, Anthem contracted for Express

---

[16] Defendant Paz was also President of Express Scripts from October 2003 to February 2014 and Senior Vice President and Chief Financial Officer from January 1998 to April 2004. *Id.*

[17] Before that, Defendant Wentworth served as the Senior Vice President of Sales and Account Management from April 2012 to February 2014. *Id.*

[18] Defendant McGinnis served in that role from August 2014 to August 2015. *Id.* From April 2012 to July 2014, he was Vice President, Legal and Business Development. *Id.* McGinnis has been employed by Express Scripts since March 2008. *Id.*

4

Scripts to provide PBM services for its beneficiaries over the next ten years (the "PBM Agreement"). *Id.* As a result, Anthem became Express Scripts' largest client, and was responsible for approximately 14% of Express Scripts' annual revenue. *Id.*

The PBM Agreement included a section entitled "Periodic Pricing Review." *Id.* ¶ 60. Under that section, Anthem or a third-party consultant would periodically review Express Scripts' pricing terms. *Id.* If the pricing was not consistent with what the contract called "competitive benchmark pricing," Anthem had the ability under the Agreement to propose renegotiated pricing terms and Express Scripts agreed to negotiate over those terms in good faith. *Id.* The PBM Agreement also required Express Scripts to perform Medicare Part D services in accordance with Medicare regulations and instructions from the Centers for Medicare and Medicaid Services ("CMS"). *Id.* ¶ 61.[19]

### C. Operational Issues: February 2014–February 2015

By early 2014, Express Scripts was failing to meet CMS-mandated turnaround times with respect to the processing of Medicare Part D claims. *Id.* ¶ 62. On February 4, 2014, Anthem issued a corrective action plan for Express Scripts. However, according to Plaintiffs, Express Scripts did not implement an adequate information technology system to process the Medicare Part D claims, and a little over a year later, on February 16, 2015, Anthem sent Express Scripts a formal notice of breach of the PBM Agreement due to operational failures. *Id.* ¶¶ 62–63. The notice of breach informed Express Scripts that Anthem had the right to terminate the PBM Agreement. *Id.*

---

[19] Specifically, CMS requires that Medicare Part D plan sponsors submit a data file (called a "PDE file") containing information with respect to each prescription drug claim filled. *Id.* Under the Agreement, Express Scripts took responsibility for timely submitting PDE files to CMS. *Id.* CMS also requires that Medicare Part D claims and coverage determinations are investigated and submitted within certain time frames. *Id.*

One week later, on February 23, 2015, Express Scripts filed its 2014 Form 10-K with the SEC. *Id.* ¶ 64.[20] The Form 10-K acknowledged that the company's financial results would be materially adversely affected if a large client changed the terms of a contract or terminated a contract. *Id.* It also acknowledged that failure to effectively execute Express Scripts' Medicare Part D program could have an adverse effect on the company. *Id.* It did not, however, mention Anthem's notice of breach nor its own alleged failures with respect to its administration of Anthem's Medicare Part D program. *Id.* ¶¶ 64–65.[21]

On February 25, 2015, Defendant Queller stated in a conference call for investors that "[W]e've got a great relationship with Anthem. . . . Our teams work together closely each and every day. The relationship is very, very solid." *Id.* ¶ 66. He added that Express Scripts "look[s] forward to having [Anthem] as a client through the end of . . . 2019 and we'd love to have them for a longer time as well." *Id.*

Anthem and Express Scripts convened its Joint Pharmacy Operating Committee ("JPOC") to attempt to resolve the operational issues, but the parties did not come to a resolution. *Id.* ¶ 67.

D. **Pricing Dispute: March 2015–March 2016**

On March 18, 2015, Anthem notified Express Scripts that it had conducted a market analysis and it believed Express Scripts' pricing was higher than "competitive benchmark pricing." *Id.* ¶ 68. Anthem proposed new pricing terms and requested that Express Scripts

---

[20] The 2014 Form 10-K was signed by Individual Defendants Paz, Havel, Knibb, Benanav, Breen, DeLaney, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, and Sternberg. *Id.*

[21] On April 28, 2015, July 28, 2015, and October 27, 2015, Express Scripts filed additional quarterly Form 10-Q Reports in which it made the same general statements without mentioning Anthem specifically. *See id.* ¶¶ 71, 75, 79.

6

respond by March 30, 2015, but Express Scripts did not do so. *Id.* On April 1, 2015, Anthem provided Express Scripts with another formal notice of breach. *Id.* ¶ 69.

A few weeks later, on April 28, 2015, Express Scripts issued a press release from Defendant Wentworth stating that the company's product offerings drove its client retention and was "in high demand." *Id.* ¶ 70. The next day, during a conference call, Defendant Paz stated that "Anthem is an incredibly important client to us," and that Express Scripts "really enjoys" its relationship with Anthem and its ability to provide services to Anthem members. *Id.* ¶ 72.

Continuing their attempts to resolve the significant differences between their companies' positions, the presidents of Anthem and Express Scripts met on May 27, 2015. *Id.* ¶ 73. They did not, however, resolve the dispute at that time. *Id.*

On July 28, 2015, Express Scripts issued a press release from Defendant Paz stating that Express Scripts' business model was "fully aligned with client needs." *Id.* ¶ 74. Defendant Wentworth also issued a statement in the same press release saying that Express Scripts was "proud of the relationships we have built with clients." *Id.* The next day, during a conference call, Defendant Wentworth stated that he was confident that Express Scripts would have strong client retention "across the board" and that the company's "business outlook remain[ed] strong." *Id.* ¶ 76.

The next month, on August 26, 2015, Express Scripts agreed to a corrective action plan with respect to Medicare Part D processing problems. *Id.* ¶ 77. However, according to Plaintiffs, Express Scripts continued to be noncompliant with respect to Medicare Part D operations. *Id.*

Despite these issues with its Anthem relationship, on an October 27, 2015 conference call, Defendant Wentworth stated that Express Scripts was "confident in the upper range of our

7

expected retention rate, a reflection of the trust clients have in Express Scripts." *Id.* ¶ 78. He made similar comments on a conference call the next day. *Id.* ¶ 80. Just a little over a week later, on November 9, 2015, Anthem and Express Scripts underwent mediation. However, their differences were not resolved. *Id.* ¶ 81.

On December 22, 2015, Express Scripts addressed its negotiations with Anthem in a conference call. Defendant Paz told investors that Express Scripts was "fully committed to reaching a mutually beneficial agreement" and that discussions with Anthem were "very early on." *Id.* ¶ 82. Over the next several weeks, Express Scripts and Anthem continued to negotiate, with Express Scripts favoring a proposal that reduced pricing by only $1 billion and Anthem favoring a proposal that reduced pricing by $9.7 billion. *Id.* ¶¶ 83–85.

During this period, on January 12, 2016, Anthem's CEO publicly threatened to terminate its relationship with Express Scripts and Anthem's general counsel announced that the two companies had exhausted the internal dispute process provided for in the PBM Agreement. *Id.* ¶ 86. Express Scripts, however, maintained that 2015 was its "strongest retention year ever" and that it was "well positioned to drive growth and deliver value to clients and shareholders." *Id.* ¶ 87.

On February 16, 2016, Express Scripts filed its 2015 Form 10-K. *Id.* ¶ 88.[22] The Form 10-K stated that the company's finances might be materially adversely affected if a large client changed the terms of a contract or terminated a contract. *Id.* With respect to Anthem in particular, the Form 10-K stated that Express Scripts was "actively engaged in good faith discussions with Anthem and intend[ed] to continue to comply with the requirements of the [PBM A]greement." *Id.* ¶ 89. During a conference call the next day, Defendant Paz told

---

[22] The Form was signed by Defendants Paz, Wentworth, Slusser, McGinnis, Benanav, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, and Sternberg. *Id.*

investors that Express Scripts was "delivering great service to Anthem" and "performing at a high level." *Id.* ¶ 91. He also referred to the ongoing—and failing—pricing renegotiations as "pretty routine." *Id.*

By mid-March 2016, both parties were still unwilling to change the pricing positions they expressed earlier that year. *Id.* ¶ 85. On March 21, 2016, Anthem sued Express Scripts for breach of contract. *Id.* ¶ 92.

### E. Procedural History

Plaintiffs filed the Complaint on September 26, 2016. *See* Compl. (Doc. 1). On November 16, 2016, Clifford Elow and Amitkumar Khandhar, moved for permissive intervention. Doc. 44. Before that motion was decided, from January 29, 2017 to April 10, 2017, the Court granted a stay pending a decision from the Judicial Panel on Multidistrict Litigation regarding whether the case would be transferred to the Eastern District of Missouri as part of a multidistrict litigation. Doc. 69. On August 2, 2017, this Court denied the motion to intervene. Doc. 90.

Separately, on June 29, 2017, Defendants moved to stay this action pending a determination in the Securities Litigation, or, in the alternative, to dismiss the Complaint. Doc. 80. On August 2, 2017, the Court dismissed the Securities Litigation complaint without prejudice. *See* Opinion and Order ("Securities Opinion") (Doc. 93), *In re Express Scripts Holdings Securities Litigation*, 16 Civ. 3338 (S.D.N.Y. 2016). In light of the Securities Opinion, Defendants urged the Court to dismiss the complaint rather than simply stay the litigation. *See* Reply Memorandum of Law in Support of Defendants' Motion to Stay, or in the Alternative, to Dismiss ("Reply Mem.") (Doc. 93), at 12 ("[I]t may now be more efficient for the Court to proceed to the merits of the Rule 23.1 and 12(b)(6) motions.").

9

## II. LEGAL STANDARD

Under Delaware law, a corporation's board of directors is responsible for determining whether or not the corporation should pursue litigation.[23] *See In re Bear Stearns Co., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 539 (S.D.N.Y. 2011); *In re Citigroup, Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009). Under both Delaware state law and Rule 23.1 of the Federal Rules of Civil Procedure, in order to cause the corporation to pursue litigation without a board's approval, a shareholder must either "(1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile." *Citigroup*, 964 A.2d at 120; *Bear Stearns*, 763 F. Supp. 2d at 539–40.

In the latter scenario, a plaintiff must plead facts "with particularity" to show demand futility. *See Bear Stearns*, 763 F. Supp. at 540. This is a higher standard than Rule 12(b)(6) pleading requirements and surviving a motion to dismiss for failure to comply with Rule 23.1 is a "difficult feat." *Canty v. Day*, 13 F. Supp. 3d 333, 342, 345 (S.D.N.Y. 2014), *aff'd* 599 F. App'x 20 (2d Cir. 2015) (quoting *Ryan v. Gifford*, 918 A.2d 341, 352 n.3 (Del. Ch. 2007)); *see also McPadden v. Sidhu*, 964 A.2d 1262, 1269 (Del. Ch. 2008). "To establish that demand is excused . . . the pleadings must comply with 'stringent requirements of factual particularity' and set forth 'particularized factual statements that are essential to the claim.'" *Citigroup*, 964 A.2d at 120–21 (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).

---

[23] Both parties agree that Delaware law applies. Memorandum of Law in Support of Defendants' Motion to Stay, or in the Alternative, to Dismiss ("Defs.' Mem.") (Doc. 81), at 3 n.4; Memorandum of Law in Opposition to Defendants' Motion to Stay, or in the Alternative, to Dismiss ("Pls.' Mem.") (Doc. 87), at 6.

Where the claim does not rest on an allegation that a particular decision of the board was wrongful, a plaintiff must meet the *Rales* standard—that is, her allegations must raise a "reasonable doubt" as to whether "a majority of the directors are disinterested and independent." *Bear Stearns*, 763 F. Supp. 2d at 540 (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)); *see also Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993). To determine whether a majority of board members are sufficiently disinterested to determine whether to file suit in those circumstances, the Second Circuit has clarified that "the mere threat of personal liability . . . is insufficient; rather, a reasonable doubt . . . should only be found where a substantial likelihood of personal liability exists." *Canty v. Day*, 599 F. App'x 20, 22 (2d Cir. 2015) (internal quotations omitted).[24]

## III. DISCUSSION

Defendants offer two main arguments in support of their position that demand should not be excused in this case. First, Defendants argue that Plaintiffs offer only group pleading and therefore did not plead demand futility with sufficient particularity as to each individual Defendant. Defs.' Mem. at 26. Second, Defendants argue that because the Securities Opinion already determined that certain statements made by Express Scripts officers were neither false nor misleading, Plaintiffs cannot show that any of the Directors face a substantial likelihood of personal liability for their alleged role in allowing those statements to be made. Reply Mem. at 2.

---

[24] Defendants argue that the *Rales* standard applies because the Complaint largely alleges "that the Directors failed to exercise oversight or passively allowed misstatements" and does not "challenge an actual decision of the Board." Defs.' Mem. at 23–24. Although Plaintiffs do not expressly state that the *Rales* standard applies, they agree that they "must demonstrate a reason to doubt that at least six of those twelve Directors are unable to disinterestedly or independently consider a demand." Pls.' Mem. at 8. The Court agrees with the parties that the *Rales* standard is the appropriate test based on the allegations set forth in the Complaint.

11

## A. Particularity

Delaware law requires that Plaintiffs proceeding derivatively must "plead facts *specific to each director*, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007). Thus, "group pleading" with respect to demand futility is insufficient on a motion to dismiss. *See Canty*, 13 F. Supp. 3d at 344–45 (quoting *Citigroup*, 964 A.2d at 121 n.36).

Plaintiffs argue that "each of the Director Defendants was aware that Anthem was accusing Express Scripts of breaching the [PBM] Agreement and that the Company's relationship with Anthem was not 'very, very solid.' And yet, each Director Defendant still made and caused to be made multiple statements to shareholders that falsely claimed there was no danger of losing Anthem as a customer." Pls.' Mem. at 9 (citing Compl. ¶¶ 66, 70, 72, 80, 82). Although Plaintiffs claim they make factual allegations with respect to "each Director Defendant," the cited paragraphs refer only to statements made by Individual Defendants Queller, Wentworth, and Paz.[25] Plaintiffs do not explain how the other Individual Defendants were involved in making material misstatements. Instead, they simply state, in a conclusory fashion, that all Defendants "caused" or "allowed" statements to be made. *Id.* at 14–15, 19 n.13; *see also Citigroup*, 964 A.2d at 133 n.88 ("Pleading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient[ly] particularized pleading to excuse demand under Rule 23.1."). Furthermore, Plaintiffs specifically disavow any theory that the individual Defendants breached their fiduciary duties through a failure of the Board's internal controls and oversight mechanisms. Pls.' Mem. at 19 n.13.[26] Thus, because

---

[25] Queller was not alleged to be a member of Express Scripts' Board of Directors.

[26] A derivative lawsuit proceeding on a failure of oversight claim must meet the *Caremark* standard, which requires a plaintiff to plead that the directors: (1) "utterly failed to implement any reporting or information system or

12

Plaintiffs have not plead specific facts relating to a majority of the Directors on Express Scripts' Board, the Court finds that they have not shown that demand was futile.[27]

## B. Misleading Statements

Even if Plaintiffs had made specific factual allegations with respect to a majority of Express Scripts Directors, Defendants argue that Plaintiffs have not alleged that *any* Director made materially misleading statements that would subject him or her to personal liability. Defs.' Mem. at 27–29; Reply Mem. at 2 ("Plaintiffs' demand futility arguments are premised entirely on their contention that all of the Directors faced a 'substantial likelihood of liability' for allegedly allowing [Express Scripts] to issue false and misleading statements—but the Court already evaluated those statements in the Securities Opinion and held that they were *not* false or misleading."). In their opposition to Defendants' motion to dismiss, Plaintiffs point to several statements, made in SEC filings, during investor calls, or contained within press releases, which they argue were misleading and subject the Directors to personal liability for breach of fiduciary duty. Pls.' Mem. at 13–14 ("Despite being informed that Anthem believed Express Scripts was not meeting its obligations under the [PBM] Agreement that accounted for such a large portion

---

controls;" or (2) "having implemented such a system or controls, consciously failed to monitor or oversee its operations . . . ." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (interpreting *Caremark*); *see also Central Laborers' Pension Fund v. Dimon*, 638 F. App'x 34 (2d Cir. 2016) (holding that *Stone* sets forth the correct standard for a *Caremark* claim). A *Caremark* claim is regarded as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[27] Plaintiffs do argue that, with respect to statements made in Express Scripts' 2014 10-K Form, a majority of the Board of Directors bear a substantial risk of liability because the Board signed the 10-K Form, as required by law. Pls.' Mem. at 14 n.9. However, the act of signing an SEC submission does not imbue the Individual Defendants with a substantial likelihood of personal liability. *See Citigroup*, 964 A.2d at 134 (rejecting a theory of liability premised on the directors' signatures on financial statements where there were no allegations that "the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions"); *see also Rahbari v. Oros*, 732 F. Supp. 2d 367, 380 ("[T]he signing of financial reports is insufficient to create an inference that the directors had actual or constructive notice of any illegality for purposes of the demand excused analysis.").

of Express Scripts' annual revenue, Defendants repeatedly told investors the exact opposite—that Express Scripts' relationship with Anthem remained strong and that Express Scripts was meeting its contractual obligations.") (citing Compl. ¶¶ 58, 62–96). The Court addresses each of these allegedly misleading statements below.

1. **SEC Filings**

As discussed above, Plaintiffs argue that Express Scripts made misrepresentations in SEC filings when those filings failed to mention the operational and financial disagreements with Anthem. On February 23, 2015, Express Scripts filed its 2014 Form 10-K in which it did not disclose that it "was already failing to execute the operational provisions in the [PBM] Agreement . . . related to Medicare Part D." Compl. ¶¶ 64–65. It did, however, state that:

> If one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected and we could experience a negative reaction in the investment community resulting in stock price declines or other adverse effects.

*Id.* ¶ 64. On April 28, 2015, Express Scripts filed a Form 10-Q for the first quarter of 2015 and incorporated general risks stated in the 2014 Form 10-K but failed to mention the operational breaches. *Id.* ¶ 71. The Form 10-Qs filed for the second and third quarters of 2015 were substantially the same with respect to Express Scripts' mention of general risks and omission of tensions in the Anthem-Express Scripts relationship. *Id.* ¶¶ 75, 79. On February 16, 2016, Express Scripts filed its 2015 Form 10-K in which it stated that it was "actively engaged in good faith discussions with Anthem" and "intend[ed] to continue to comply with the requirements of the [PBM A]greement." *Id.* ¶ 89. It did not, however, provide detail on the state of pricing renegotiations at that time. *Id.* ¶ 88.

In a similar context in the Securities Litigation, this Court found that because there was no "definitive statement that Anthem no longer intended to do business with Express Scripts," the securities plaintiffs did not allege facts "that triggered a duty to disclose [the nature of the Anthem-Express Scripts relationship] before December 2015." *In Re Express Scripts Holding Co. Sec. Litig.*, No 16 Civ. 3338 (ER), 2017 WL 3278930, at *13 (Aug. 1, 2017). Here, Plaintiffs have largely only offered allegations that Express Scripts should have been more candid about the Anthem relationship in its SEC filings, not that Express Scripts' statements regarding risks in its SEC filings was, itself, untrue. For the same reasons as stated in the Securities Opinion, then, the Court finds that Plaintiffs cannot show demand futility by pointing to these statements in Express Scripts' SEC filings, which discuss general risks and state that Express Scripts was renegotiating with Anthem without delving into further detail about the exact dispute between the parties.

### 2. Investor Calls

Plaintiffs also allege that certain statements made on investor calls throughout 2015 and early 2016 constitute misrepresentations about Express Scripts' relationship with Anthem.

- On February 25, 2015, Defendant Queller stated that "we've got a great relationship with Anthem. . . . Our teams work together closely each and every day. The relationship is very, very solid." Compl. ¶ 66. He added that Express Scripts "look[s] forward to having [Anthem] as a client through the end of the contract term which is at the end of 2019 and [would] love to have them for a longer time as well." *Id.*

- On April 29, 2015, Defendant Paz told investors on a conference call that "Anthem is an incredibly important client to [Express Scripts]. And I think we do very good things together." *Id.* ¶ 72. He added that Express Scripts "really enjoy[s]" its relationship with Anthem and providing services to Anthem members. *Id.*

- On July 29, 2015, Express Scripts held a conference call, in which Defendant Wentworth stated that the company's client feedback "gives us confidence that

15

we will have strong retention across the board." *Id.* ¶ 76. He also emphasized the "close collaboration" between Express Scripts and its clients. *Id.*

- On October 28, 2015, Defendant Wentworth told investors that Express Scripts had "strong client relationships" and was "confident about next year's selling and retention season." *Id.* ¶ 80.

- On December 22, 2015, Defendant Paz discussed the Anthem-Express Scripts pricing renegotiations on a conference call with analysts and investors. *Id.* ¶ 82. He stated that Express Scripts had "delivered quality care for Anthem's members" and that Express Scripts was "fully committed to reaching a mutually beneficial agreement" with Anthem. *Id.*

- Defendant Paz discussed the relationship again during a February 17, 2016 conference call. *Id.* ¶ 91. He stated that Express Scripts was "performing at a high level financially" and was "delivering great service to Anthem and its members." He added that Express Scripts was "fully committed to good faith negotiations" and that such pricing renegotiations were "pretty routine." *Id.*

In the Securities Litigation, the parties referenced at least four of these comments. *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. 78) at 16, 21. In dismissing the complaint, this Court determined that the late 2015 and early 2016 statements were "statements about negotiations" which were "not actionable." *Express Scripts Holding Company*, 2017 WL 3278930, at *13 (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). Further, the Court's opinion emphasized that "statements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to allege material misrepresentations. *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)). The nearly identical alleged misstatements that Plaintiffs point to here fare no better. Two statements—from July 29th and October 28th—do not mention Anthem, and simply discuss Express Scripts' overall client relationships. The other statements offer mere opinions either about Anthem generally—for example, that the relationship between Express Scripts and Anthem was "great"—or about the negotiations—for example, that Express Scripts was "fully committed" to negotiating. Thus, the Court finds that these statements do not support the finding

16

that any Directors face a substantial likelihood of personal liability and do not support excusing demand.

### 3. Press Releases

Finally, Plaintiffs point to statements made by Defendants Paz and Wentworth in press releases issued by Express Scripts, arguing that those statements were false and misleading.

- On April 28, 2015, Defendant Wentworth stated in an Express Scripts press release that Express Scripts' model "is embedded in our innovative solutions that are clearly differentiated and in high demand." Compl. ¶ 70.

- In a July 28, 2015 press release Defendants Wentworth and Paz made similar generic statements. *Id.* ¶ 74. Defendant Paz stated that Express Scripts' business model was "fully aligned with client needs" and "focused on our clients' best interests." *Id.* He added that the company was "well positioned to serve clients." *Id.* Defendant Wentworth stated that Express Scripts was "proud of the relationships we have built with clients." *Id.*

- On October 27, 2015, Express Scripts issued another press release. *Id.* ¶ 78. Defendant Wentworth stated that Express Scripts was "confident in the upper range of our expected retention rate, a reflection of the trust clients have in Express Scripts." *Id.*

- On February 16, 2016, Express Scripts issued a press release in which Defendant Wentworth stated that 2015 was the "strongest retention year ever" for Express Scripts and that the company remained "well positioned to drive growth and deliver value to clients and shareholders." *Id.* ¶ 87.

These statements were not discussed in the Securities Litigation. However, none of these statements even mention Anthem, much less provide details (misleading or otherwise) about the Anthem-Express Scripts relationship. Instead, these statements touting Express Scripts' business model at a high level are exactly the kind of "puffery" this Circuit has determined is insufficient to generate liability. *See Novak*, 216 F.3d at 315; *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014) ("Rosy predictions, or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable.") (internal quotations omitted). Therefore, these statements also do not

17

support Plaintiffs' allegation that demand was excused, and the Court therefore finds that Plaintiffs have failed to comply with the requirements of Rule 23.1.[28]

## IV. AMENDMENT

Plaintiffs request leave to amend their complaint. Pls.' Mem. at 31. Defendants argue that amendment should not be granted because when the Court provided Plaintiffs an opportunity to amend by May 30, 2017, Plaintiffs chose not to do so. Reply Mem. at 13 n.9.

A court may deny leave to amend a complaint for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). A court may deny amendment on the basis of futility "only where no colorable grounds exist to support the proposed claim." *Allison v. Clos-ette Too, L.L.C.*, No. 14 Civ. 1618 (LAK) (JCF), 2015 WL 136102, at *2 (S.D.N.Y. Jan. 9, 2015). In *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, the Second Circuit reaffirmed that the "liberal spirit" of Federal Rule of Civil Procedure 15 embodies a "strong preference for resolving disputes on the merits." 797 F.3d 160, 190–91 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)). This is especially true, the Second Circuit explained, for a case involving "a complex commercial reality with a long, multi-prong complaint" that has not had "the benefit of a ruling" that highlights "the precise defects" of the complaint. *Id.*

---

[28] Plaintiffs did not plead demand futility with respect to their claims for waste and unjust enrichment. They argue that "courts routinely conclude that defendants face a substantial likelihood of liability for unjust enrichment and waste claims where, as here, defendants face a substantial likelihood of liability for a breach of fiduciary duty claim and all claims rest on the same underlying facts or theories." Pls.' Mem. at 20 n.15. Defendants argue that Plaintiffs must "plead facts to establish a substantial likelihood of liability on a claim-by-claim basis." Reply Mem. at 10 n.8. Regardless, because the Court finds that Plaintiffs did not show demand futility with respect to breach of fiduciary duty, and Plaintiffs make no different allegations with respect to a likelihood of Director liability for waste and unjust enrichment, demand is not excused for those claims.

Here, not only will Plaintiffs have the benefit of this opinion when drafting an amended complaint, they will also have the benefit of the Court's decision in the Securities Litigation. Therefore, the Court finds that there is no basis to deny amendment and the Complaint will be dismissed without prejudice.

## V.     CONCLUSION

Defendants' motion to dismiss is GRANTED without prejudice and its motion to stay is DENIED AS MOOT. Defendants' motion for oral argument is also DENIED AS MOOT. The Clerk of Court is respectfully directed to terminate the motions (Docs. 80 and 94). Plaintiffs must amend, if at all, by February 28, 2018.

It is SO ORDERED.


Dated:   January 23, 2018
         New York, New York

                                                        _____
                                                        Edgardo Ramos, U.S.D.J.